364 So.2d 639 (1978)
OLINKRAFT, INC., Plaintiff-Appellee,
v.
Charles H. Coster GERARD, Defendant-Appellant.
No. 13658.
Court of Appeal of Louisiana, Second Circuit.
October 30, 1978.
*640 Shotwell, Brown & Sperry by Burt W. Sperry and George Wear, Jr., Monroe, for plaintiff-appellee.
Bodenheimer, Jones, Klotz & Simmons by David B. Klotz, Shreveport, for defendant-appellant.
Before BOLIN, HALL and JONES, JJ.
JONES, Judge.
Defendant, Charles H. Gerard, appeals a judgment rendered in this declaratory judgment proceedings which (1) denied the cancellation, insofar as it was applicable to gas produced from Section 35, of a Gas Sale and Purchase Contract between Franks Petroleum, Inc. and Olinkraft, Inc. (2) denied him an increase in the price of the gas above that provided for in the Franks-Olin contract and (3) denied payment for all gas not taken, based upon deliverability of 2000 MCF per day between the period of August 20, 1975 and January 29, 1976. We affirm.
Defendant acquired by assignment from Franks leases in Section 35 subject to the Gas Sale and Purchase Contract between Franks and Olin. The contract provided Olin was entitled to receive 33.3975% of all gas produced in Section 35.
Defendant also owned approximately 21% of the leases on adjacent Section 36, however, none of any production which he might receive from these leases was dedicated to the Franks-Olin contract. Approximately 50% of the leases in Section 36, owned by others, was subject to the Franks-Olin contract and from which Olin was entitled to the gas production.
In the fall of 1974, Olin was interested in securing at the earliest possible date, gas production in Sections 35 and 36 in order to provide gas for the operation of its papermill in Ouachita Parish, Louisiana. As an incentive to encourage the defendant to *641 diligently seek production in Sections 35 and 36 Olin, on October 21, 1974[1] offered defendant an increase in the price from $.435 MCF provided for in the Franks-Olin contract to $.57 MCF for all gas it purchased produced from Section 35. The price increase was conditioned upon defendant advising Olin before November 11, that he was committed to the drilling and participation in a well in Section 35 (Sanford well) and a well in Section 36 (Browder well) and upon both wells being commenced (spudded) before December 31, 1974.
The defendant by letter to Olin on November 5, 1974 accepted the terms and conditions of Olin's letter of October 21, 1974. Defendant spudded the Sanford well in Section 35 on November 22, 1974 and had prior to that date entered into an agreement with all other lease owners in Section 36 designating Tensas Delta Land Company as an operator to secure the drilling of the Browder well. On November 12, 1974, Tensas Delta contracted with Garrett and Starkey to drill the Browder well with a contemplated spudding date of on or before December 31, 1974.
On December 19, 1974, Tensas Delta requested permission of all working interest owners to change the starting date of the Browder well to January 31, 1975 and the defendant agreed to this change on December 20, 1974. All other working interest owners agreed to the change in the drilling contract and it was changed. The change in the starting date of the Browder well was requested because Sawyer Drilling and Service, Inc., who had subcontracted the drilling of the well from Garrett and Starkey, did not have a rig available to commence the well until the latter part of January 1975.
Because defendant would not be entitled to the increase in the gas price for his production in Section 35 if the Browder well in Section 36 was not spudded by December 31, 1974, he sought an extension of the required spudding date from Olin. Olin denied the extension. Defendant then, with the permission of Tensas Delta, Garrett and Starkey, and Sawyer, had an 18 inch diameter, 22 foot hole drilled by a water well drilling rig at the Browder well site and inserted in the hole a conductor pipe on December 31, 1974 in an attempt to comply with the spudding requirements of his Olin agreement. The pipe was not cemented into place in accord with the practice usually followed in connection with the installation of conductor pipes. The actual arrangements for the drilling of the 22 foot hole and the installation of the conductor pipe were made with the water well drilling company by Sawyer at the request of the defendant. The specifications of the drilling contract for the Browder well did not provide for the installation of a conductor *642 pipe. The installation of the conductor pipe, which cost approximately $1,000, was billed to and paid for by the defendant.
In the latter part of December 1974, there was some preliminary dirt work on the Browder location, however, Sawyer did not bring the deep well drilling rig to the Browder location until January 22, 1975, and the actual drilling of the well was not commenced until January 24, 1975.
The Sanford well was completed as a producer and Olin received its first delivery from it September 27, 1975. Olin considered the Browder well to have been spudded on January 24, 1975 and rejected defendant's contention that the well was spudded by the drilling of the 22 foot hole and installation of the conductor pipe on December 31, 1974. Olin paid for the Sanford gas at the rate of $.435 MCF as provided for in the Franks-Olin contract, rather than at the rate of $.57 MCF which it had offered in its letter of October 21, 1974.
In addition to the price issue, the parties have an unrelated dispute with regard to Olin's obligation to pay under the "take or pay" provision of the Franks-Olin contract on the gas produced from the Sanford well. Defendant contends that deliverability of the Sanford well was established by the Louisiana Department of Conservation test at 2000 MCF per day and that under the terms of the contract, Olin was required to take 33.3975% of a minimum of 2000 MCF per day whether or not this volume of gas was actually produced. Defendant contends Olin was required to pay for all gas not taken by it up to the minimum amount calculated upon 2000 MCF per day for each day commencing the day of the first production, August 20, 1975, until January 29, 1976 (excluding the last 17 days of October when the well was admitted to be out of production) after which date Olin was taking more than it was required to take based upon this formula. The applicable provisions of the contract are:
"The term `Minimum Quantity' shall mean an average daily quantity of gas in each Contract year, determined as provided in Article IV of this contract, which Buyer is obligated to take or pay for if available to Buyer and not taken. (Article I)
2. Subject to the other provisions hereof, Buyer agrees to purchase and receive from Seller, on as nearly a uniform daily basis as the operation of Buyer's pipeline and manufacturing plants will permit, a quantity of gas each day during the term hereof which will average in each calendar month not less than the greater of (i) the sum of: (a) Seller's interest in two and one-half million (2,500,000) cubic feet of gas for each well completion capable of delivering two and one-half million (2,500,000) cubic feet of gas per day or more (b) Seller's interest in the total deliverability of each well completion capable of delivering less than two and one-half million (2,500,000) cubic feet of gas per day . . . . (Article IV(2).
The quantity of gas which the wells heretofore accepted by Buyer as being subject hereto are capable of producing may be redetermined upon the request of either Buyer or Seller not more than once during any Contract Year and the resulting revision of Minimum Quantity, if any, shall become and remain effective until superseded by a subsequent redetermination. (Article IV, Paragraph 2, pages 8 and 9).
7. All determinations or redeterminations of the deliverability of Seller's wells for the purpose of this agreement shall be made by the agreement of Buyer and Seller, or, in the absence of such agreement, the parties shall select a recognized and reputable firm or individual experienced in testing for deliverability who shall make such determination. In the event the parties are unable to agree upon a mutually acceptable firm or individual to make such determination, the matter shall be submitted to arbitration as provided in Exhibit `C'. (Article IV, Paragraph 7)
3. During the term hereof should Buyer fail in any calendar month (prorate for any portion of a calendar month) to take the sum of the daily Minimum Quantities *643 in effect during such calendar month, Buyer shall pay to Seller the aggregate amount which Seller would have received had such deficiency been purchased at the price in effect for such calendar month. If, on one or more days during any calendar month, Seller fails, whether or not by reason of force majeure, to deliver to Buyer the full quantity of gas requested by Buyer up to the Contract Quantity, then the total of the Minimum Quantities which Buyer is obligated to take or pay for during such month shall be reduced by the aggregate amount of such deficiencies in Seller's deliveries which were requested by Buyer . . . (Article IV(3).

Billing and Payment
1. On or before the twenty-fifth (25th) day of each calendar month after deliveries of gas are commenced hereunder, Buyer shall render a statement to Seller, showing the amount of gas delivered during the preceding month, together with check in the amount due therefor and with sufficient information to explain and support any adjustments made by Buyer with respect to the value of gas delivered in determining the amounts stated to be due. Within twenty-five (25) days after the end of each calendar month Buyer shall render Seller a statement to cover payments due for gas available and required to be paid for when not taken, together with check in the amount due therefor. For the purpose of price the gas required to be paid for when not taken shall be considered to have the BTU content of the gas last actually delivered prior to the maturation of the obligation to pay for gas not taken. (Pages 15 and 16)
2. Should Buyer fail to pay the full amount due Seller when the same is due, as herein provided, interest thereon shall accrue at the rate of eight percent (8%) per annum from the date when such payment is due until the same is paid. If such failure to pay continues sixty (60) days, seller may suspend deliveries of gas hereunder but the exercise of such right shall be in addition to any and all other remedies available to Seller."
Olin argues that until minimum deliverability is established in accordance with Article IV, Section VII of the contract, it is only required to pay for gas actually received.
The defendant seeks cancellation of the contract based upon Olin's failure to pay the increased price for gas provided for in its letter of October 21, 1974, and upon Olin's failure to pay for gas not taken based upon a minimum daily deliverability of 2000 MCF.

ISSUES
The issues are contained in the defendant's assignment of errors. The defendant contends that the trial judge was in error in finding: (1) that he was not entitled to an increase in the price of gas above that provided for in the Franks-Olin contract because there was no good faith spudding of the Browder well prior to December 31, 1974 (2) that Olin was not required to take or pay for its dedicated percentage of 2000 MCF per day commencing August 20, 1975 and (3) there was no default justifying a cancellation of the contract.
DID DEFENDANT TIMELY SPUD THE BROWDER WELL?
In order for the defendant to be entitled to the increase in the price of gas he was required to have spudded the Browder well not later than December 31, 1974. The term "spudded" was defined in the decision of Hilliard v. Franzheim, 180 So.2d 746 (La.App. 3d Cir. 1965) as follows:
"In the first place, the term "spud in" has a well defined-meaning in the oil and gas industry as the first boring of the hole in the ground, that is, the first actual penetration of the earth with a drilling bit." Id. page 747.
Hilliard made a clear distinction between what was necessary to spud a well and what was necessary to commence a well. The court defined "commence a well" as follows:

*644 ". . . the general rule to be drawn from these decisions is that actual drilling is unnecessary to `commence' a well within the meaning of the lease provisions; and that substantial surface preparations to drill are sufficient to be considered `commencement' of drilling operations for a lease-clause purposes, such as making and clearing a location, delivering equipment to the well site, and the like, provided that such preliminary operations are continued in good faith and with due diligence until the well is actually spudded in." (emphasis added) Id. page 748.
While there is no decision directly in point on what constitutes good faith spudding, the law is well established that when the requirement is the commencement of a well on a critical date for the purpose of maintaining viability of a lease beyond the primary term or interruption of prescription of a mineral servitude, that the activity involved must be such that it can be construed to be performed in a good faith attempt to drill the well. The essence of the good faith requirement is that the activities performed must be necessary for the drilling of the well and they must be pursued with diligent continuity.
The court, in the decision of Keebler v. Seubert, 167 La. 901,120 So. 591, 592 (1929) in holding that the running of prescription of a mineral servitude had been interrupted, made the following statement:
". . . the actual drilling was begun on April 1, 1927, four [4] days before the expiration of the ten years from the making of the reservation, and notwithstanding the institution of this suit five [5] days later, operations were conducted continuously to a depth of 2,003 feet, when they were suspended on May 5, 1927 on account of the flood of that year."
In the decision of Matlock Oil v. Gerard, 263 So.2d 413 (La.App. 2d Cir. 1972) the court rejected a mineral servitude owner's contention that prescription had been interrupted by drilling a well to a depth of 8,800 feet to the Sexton Formation on a tract that was not subject to the mineral servitude, but was within a Conservation Commission unit with the tract subject to the servitude. The unit was created by an order of the Conservation Commission for the purpose of producing the lower Hosston Formation which was located at a depth of not more than 7,200 feet. As the well was drilled to the Sexton Formation it passed through the Hosston Formation. The court found the acquisition of the drilling permit at a location in the section different from that required by the Conservation Commission order for a well far deeper than the lower Hosston Formation, along with drilling activity which made no attempt to test the Hosston Formation established an absence of any good faith attempt to produce the lower Hosston Formation. For this reason there had been no good faith drilling on any part of the unit created by the Conservation Commission for the production of the Hosston Formation. The court concluded the existing rule of Mire v. Hawkins, 249 La. 278, 186 So.2d 591 (1966) which permitted any good faith drilling within a unit created by the Conservation Commission to constitute use of the servitude on any property located within the unit, was inapplicable.
In the decision of Allen v. Continental Oil Company, 255 So.2d 842 (La.App. 2d Cir. 1971), wherein the court was concerned with whether a well had been commenced within the primary term of a lease, the court found substantial surface preparations to drill the well prior to the expiration date on the lease included: (1) the staking of the drilling location (2) clearing operations for the road by the use of a bulldozer (3) construction of slush pits (4) grading of the well site (5) partial construction of the access road (6) laying of necessary gas and water lines to the well site and (7) attempts to move a deep well drilling rig on the property which was aborted only by heavy rain.
The court concluded all of this activity prior to the date of the expiration of the primary term of the lease, followed by the installation of a 34 foot conductor pipe by the use of a spudding rig, on the day following *645 the expiration of the primary term, and the actual drilling by the big rig nine (9) days following the expiration date of the primary term, and the drilling of a well continuously to its conclusion, satisfied the requirement of the lease even though the actual drilling of the well was not commenced until after the expiration of the primary term.
The good faith preparations necessary for the drilling of the well prior to the lease expiration date, followed by continuous, diligent effort to drill the well, was the reason for the court's conclusion.
Defendant contends that the use of the spudder rig to install the conductor pipe, prior to the use of the large rig to drill the hole, results in the Allen case being authority for holding in the instant case that the well was spudded December 31, 1974.
There is no indication in the Allen case that the installation of the conductor pipe was not required and necessary to the drilling of the well. It was installed along with other extensive necessary preparations of the drilling site and there was diligent continuing activity culminating in the actual commencement of the drilling activities by the deep well rig within nine (9) days of the critical date.
The circumstances in the Allen case are totally different from those involved here and while it supports the defendant's expert testimony that a small rig may be utilized for the purpose of spudding a deep well, it does not hold such activities performed in bad faith can create the spudding of a well. The Allen case involved the question of commencement of a well and not spudding.
We find that the good faith test applicable to the determination of "commencement of a well" before a given date, is also applicable to a determination of a contractual requirement that the well be "spudded" before a designated date.
As a prerequisite to applying the good faith test to defendant's activities, the trial court made the following findings of fact:
"The drilling contract with Garrett and Starkey which was subbed out to Sawyer, was a turnkey contract which did not specifically call for the setting of a conductor pipe.
A conductor pipe, while convenient, is not essential to the drilling of a well such as this one, and the tool pusher at the well testified that this one was not necessary and served no useful purpose  was not used.
Gerard had agreed the actual drilling would not commence until the latter part of January. In order to protect its opportunity to receive an increased price for the gas to be produced, Gerard first asked for an extension beyond December 31st to spud the well and then he employed another party (not the driller) to drill the 20 foot hole and place a 16 inch conductor pipe in it. This action had no bearing on the lease (sic) well itself.
Most of the time, conductor pipe is cemented in place. This was not done in this instance, but for some reason, a person  not positively identified  put on the report that the pipe was cemented in place."
These findings of fact are supported by the record. The activity of the defendant on December 31, 1974 in having the shallow hole drilled and the conductor pipe placed in it, was not necessary to the drilling of the Browder well. It was performed by defendant solely for the purpose of attempting to comply with his Olin agreement. He knew there would be no continuous diligent drilling activity following the drilling of the conductor hole. He had agreed with other working interest owners that the drilling of the well would be delayed until January 31, 1975. There was a lapse of three weeks before the drilling rig that was used to drill the well was brought on the site. There was no continuity of activity directed toward the creation of a hole in the ground from which minerals could be produced.
Under these circumstances, there was no good faith spudding of the Browder well until the deep well drilling rig commenced to drill into the earth on January 24, 1975. *646 The defendant failed to meet the requirement of spudding the Browder well before December 31, 1974, which was necessary for it to become entitled to a rate for its gas above that provided for in the Franks-Olin contract.
MINIMUM DELIVERABILITY OF THE SANFORD WELL
The gas production from the Sanford well not dedicated to Olin under the Franks-Olin contract was dedicated to Arkansas Louisiana Gas Company. The defendant operated the well and delivered the gas to the Olin pipeline and the Arkla pipeline. The defendant initially planned to divide the gas between the two purchasers by delivering all of the gas for approximately 2/3 of each month to Arkla and all of the gas for approximately 1/3 of the month to Olin. Defendant commenced gas delivery to Arkla on August 20, and following demand for gas by Olin, commenced delivery to it on September 27th. When Olin was advised of the manner in which the defendant contemplated the division of the gas for the purpose of delivery to it, Olin made demand for its gas to be delivered on a daily basis as required by the contract. In order for the gas to be delivered in this manner, the defendant was required to install a SPLIT STREAM MECHANISM which divided the gas approximately 1/3 to Olin and 2/3 to Arkla for simultaneous delivery to each purchaser.
Though Olin had accepted gas the last four days in September, it first became obligated to accept its dedicated percentage of the gas on November 1, on which date the defendant completed the installation of the equipment necessary to provide simultaneous SPLIT STREAM delivery to Olin and Arkla.
The contract contemplated the daily deliverability of the well would be determined and that Olin would be required to purchase its dedicated percentage of the determined daily deliverability of the well, or in the event it did not take the required amount of gas, it would be obligated to pay for same on the billing date just as if it had in fact received the gas. The contract contained a MAKE UP provision entitling Olin to later receive the gas paid for but not taken "free of cost", subject to certain price adjustments. The defendant contends that the daily minimum deliverability of his well was established at 2000 MCF per day by the Louisiana Conservation Commission test of September 20, 1975. Defendant argues that Olin was required to take daily 33.3975 times 2000 MCF or 667.95 MCF per day, and in the event it failed to take this minimum amount, that it was required to pay for that not taken.
An official of the Conservation Commission testified that the fact their test indicated on a given day that the well was capable of producing 2000 MCF did not establish it would continuously deliver daily this amount of gas. The validity of this conclusion is substantiated by the McGuire Report of the production of this well, which was introduced into evidence as a joint plaintiff and defendant exhibit, which reflects that the well produced 2000 MCF or more only 2 days in September, no days in October, November and December, and 11 days in January, 1976.
The contract provides the minimum deliverability of the well is to be established by agreement between the parties or in absence of their agreement, by an expert selected by the parties or in default of agreement in the selection of an expert, by the arbitration provisions in the contract.
Because the 2000 MCF deliverability of the well asserted by the defendant was not established as required by the contract, Olin was not required to pay for gas not taken based upon the Conservation Commission's deliverability test.
The trial court found Olin had admitted that where deliverability is not established in the manner provided for in the contract, that deliverability of the well was the actual amount of gas produced and that Olin was required to pay for its percentage of gas produced which it did not take. This finding is supported by the record. Olin was required to take none of the production from the well until November 1, when defendant *647 first became capable of split stream delivery from the well in the manner required by the contract. Olin commenced to take gas from the well on a daily basis on November 1, 1975. Though Olin requested that its delivery be reduced by 20% below its required take commencing November 17, the McGuire Report[2] reflects that Olin actually received 159.7 MCF in excess of its required take in the month of November, and therefore was not required to pay for any gas not taken during this month. The McGuire Report reflects that Olin failed to take 5082 MCF of its required take in December and therefore, it was required by the contract to pay for the gas not taken, along with the gas taken, as of the contract billing date of January 25, and this it failed to do.
On January 28, 1976, Olin increased its take substantially above its required percentage and the McGuire Report reflects that it actually received 404 MCF above its required take in January, which excess take reduced its deficit take of December to 4678 MCF. Olin continued taking in excess of the required take during the month of February and by the elapse of the first ten days of February had made up its deficit take for which it did not pay for in the month of December. The January take (which included the 404 MCF excess) was paid for on February 25, thus only leaving the 4678 MCF of the gas which Olin had failed to take and pay for in December unpaid for. On March 13, by a special billing, the defendant received payment for 3903 MCF of the gas not taken and not paid for in December, and on the 23rd of March, following the standard billing practices as required by the contract, defendant received payment for February gas which included the remaining 615 MCF of gas which Olin had failed to take in December and which had not theretofore been paid for.
Under these circumstances, Olin had received all required gas not taken by February 10 and paid for all gas not taken which it was required to take by March 13, with the exception of 615 MCF. The defendant gave Olin notice of default by letter dated January 29, 1976 and gave it 30 days (as required by the contract) to cure the default, which delay for compliance was thereafter voluntarily extended by the defendant to March 15,1976. Thus before the expiration of the extended compliance date of March 15, Olin's only contractual failure was being indebted for gas not taken in December in the amount of $267 and this was paid for on March 23, within 8 days following the default compliance date. The only other sum owed by Olin under the contract, subsequent to March 23, was 8% per annum interest owed on the purchase price of the 5082 MCF not taken in December and only fully paid for by March 23. This interest was awarded against Olin in the trial court's judgment in the amount of $32.08.
Olin's failure to pay the small balance on the gas not taken and not paid for in December for 8 days following default compliance date and its failure to pay the small amount of interest due on the unpaid for not taken gas results in a very minor breach of contract when considered in light of the large overall sums involved. Olin's good faith is established by its having prior to the extended default compliance date, instituted this declaratory judgment action on March 9, 1976, for the purpose of having its rights and obligations under the gas purchase contract judicially determined.
Olin substantially complied with all of its contractual obligations and the trial court did not abuse its discretion in refusing to cancel the contract.
For the reasons assigned the judgment is AFFIRMED at appellant's cost.
NOTES
[1] "C. H. C. Gerard 104 Lane Building Shreveport, Louisiana 71101 Attention: Mr. Joe A. Wojtkiewicz
 Subject: South Drew Field
 Proposed Wells in
 Sections 35 and 36,
 Township 18 North
 Range 2 East,
 Ouachita Parish, Louisiana

Gentlemen:
In order to eliminate the possibility of any misunderstanding, this letter is written to set forth Olinkraft's proposal regarding the timely commencement of the captioned wells. Olinkraft is willing to amend their gas purchase contract with Franks Petroleum Inc., insofar and only insofar as the acreage in Section 35, Township 18 North, Range 2 East is concerned, to provide that the price and annual escalations to be paid for gas produced from said well be changed to conform with the price and annual escalations provided for in the gas purchase contract and drilling agreement between C. H. C. Gerard and Arkla Gas Company covering said Section 35, provided: (1) the gross price does not exceed $.57/MCF and an annual escalation of $.01 per MCF plus BTU adjustment, and (2) Olinkraft has received written notification by November 11, 1974, that C. H. C. Gerard has committed to the drilling and participation in the subject wells to be commenced on or before December 31, 1974. This proposal will be considered null and void if said notice is not received by November 11, 1974, or either of said wells is not commenced (spudded) on or before December 31, 1974. Please advise if the above is not as you understood our proposal.
 Very truly yours,
 OLINKRAFT, INC.
 Donald R. Worden
 Exploration and Minerals Manager"
DRW:bs

[2] The McGuire Report references to Olin's take contained in this opinion for the months of November, December and January, have been recalculated to correctly reflect the amount of Olin's surplus or deficit take based upon the correct percentage of 33.3975 rather than the incorrect percentage of 32.17, which was used in the report.