JASPER E. JONES, Judge.
These consolidated cases are based upon alleged contractual breaches of a sale and purchase agreement executed on the 14th day of December, 1979 between Mitchell’s Shreveport Restaurant Equipment Parts, Inc. and Bana Commercial Kitchen Parts, Inc., and contracts executed pursuant to it by Bana Commercial Kitchen Parts, Inc., Mitchell’s Shreveport Restaurant Equipment Service, Inc. and Mitchell Restaurant Equipment, Inc.
Mitchell’s Shreveport Restaurant Equipment Service, Inc. and Mitchell Restaurant Equipment, Inc. are engaged in the service of commercial food cooking and refrigeration equipment. Prior to the contracts from which this litigation resulted, Mitchell’s Shreveport Restaurant Equipment Parts, Inc. supplied the parts to the Mitch-ells’ service companies which were used by them in the maintenance of the commercial cooking and refrigeration equipment.[1] The principal shareholders and officers of the two Mitchell service corporations and the Mitchell parts corporation are Robert J. Mitchell and Michael Mitchell.
Bana Commercial Kitchen Parts, Inc. executed the sale and purchase agreement for the purpose of acquiring the assets of the Mitchell parts corporation. This agreement provided that the Mitchell service companies were required to buy all of their parts, with certain limited exceptions which will be later discussed in detail, from Bana and that the agreement further provided that Bana tvould not engage in any service work. Pursuant to the sale and purchase agreement the transfer of the assets of Mitchell Parts to Bana was completed on December 31, 1979 and during the first few days of January, 1980.
On December 31, 1979 Bana executed an installment promissory note for $241,189.00 payable to Mitchell’s Shreveport Restaurant Equipment Parts, Inc. for the credit portion of the purchase price of the assets of the Mitchell parts corporation, which note was secured by a chattel mortgage on the inventory acquired from Mitchell Parts and the office equipment, furniture and fixtures acquired from Mitchell Parts.
On December 31, 1979, pursuant to the sale and purchase agreement, an exclusive service and parts purchase agreement was executed between the two Mitchell service corporations (Mitchell’s Shreveport Restaurant Equipment Service, Inc. and Mitchell Restaurant Equipment, Inc.) and Bana Commercial Kitchen Parts, Inc., wherein the Mitchell service companies agreed to purchase all of the parts used by them in their service work, with certain exceptions which will be later detailed, from Bana. *895 The price to be charged by Bana for the parts was designated to be 150% of Bana’s current replacement cost. Under some circumstances, which are not pertinent to this litigation, the charges to be made by Bana for the parts sold to the service companies were based upon other formulas.
Exclusive parts distributorship contracts from numerous manufacturers of commercial food equipment were included in the assets of the Mitchell parts corporation which were conveyed to Bana. These contracts required the distributor to provide service for the equipment sold by the manufacturer. In the exclusive service and parts purchase agreement Mitchells’ service corporations agreed to provide service for all of the equipment sold by the manufacturers from whom Bana held exclusive parts distributor contracts. Bana agreed in the exclusive service and parts purchase agreement to engage in no service work.
Robert J. Mitchell and Michael Mitchell executed an agreement wherein they guaranteed to Bana the performance of the exclusive service and parts purchase agreement by the two Mitchell service corporations.
Following the consummation of the sale by Mitchell’s Shreveport Restaurant Equipment Parts, Inc. to Bana, the parts corporation changed its name to Mitchell’s Refrigeration, Inc. The first filed of these four consolidated lawsuits was Mitchell’s Refrigeration, Inc. v. Bana Commercial Kitchen Parts, Inc., Court of Appeal # 16,-804-CA. In this suit, which was filed on January 20, 1981, the plaintiff sought a judgment for the balance of $154,070.10 on the Bana chattel mortgage note and the enforcement of the chattel mortgage, contending that Bana had violated the terms of the chattel mortgage by disposing of a substantial portion of the inventory which secured the chattel mortgage out of the ordinary course of business to the prejudice of the chattel mortgage.
The trial court rejected the plaintiff’s demands and the plaintiff appealed.[2]
On January 21, 1981 in the suit styled Mitchell’s Shreveport Equipment Restaurant Service, Inc. and Mitchell Restaurant Equipment, Inc. v. Bana Commercial Parts, Inc., Court of Appeal # 16,805-CA, the Mitchell service corporations sued Bana for cancellation of the exclusive service and parts purchase agreement and for damages. The plaintiffs alleged that Bana had violated the agreement by charging them more than 150% of Bana’s replacement costs for parts sold to them by Bana. Plaintiffs further contended that Bana had violated the contract by selling them parts which were not genuine factory replacement parts. Plaintiffs further contend that Bana had breached the agreement by engaging in service of equipment sold by Bana’s distributors contrary to the agreement by the terms of which Bana was not to engage in the service business. The trial court rejected the plaintiffs’ demands and plaintiffs appeal.
The exclusive service and parts purchase agreement contained a provision that in the event the Mitchell service corporations purchased parts from others which they were required to purchase from Bana, that this contractual violation would be considered an offer by the service corporations to sell their assets to Bana, according to specific price determination methods contained in the contract.
On January 23, 1981 in a suit styled Bana Commercial Kitchen Parts, Inc. v. Mitchell’s Shreveport Restaurant Equipment Service, Inc., Mitchell Restaurant Equipment, Inc., Robert J. Mitchell and Michael Mitchell, Court of Appeal # 16,-818-CA, Bana sued the named defendants alleging the service corporations had bought parts which they were required to buy from Bana from others and had thereby given Bana the option to purchase their service business, which option Bana here sought to enforce. Bana also sued for *896 monetary damages due to the alleged contractual violation of the Mitchell service corporations. The trial court rejected Bana’s demands and Bana appealed.
In the sale and purchase agreement Mitchell Parts agreed that in the event Bana’s 1980 sales were less than $480,-000.00, excluding sales by Bana to Acme American Repairs, Inc., that it would pay Bana the difference between Bana’s sales and $480,000.00, subject to a maximum payment by Mitchell Parts to Bana of $50,-000.00. This agreement by Mitchell Parts was guaranteed by Robert J. and Michael J. Mitchell. Bana’s sales in 1980, excluding those made to Acme American, were $419,-354.00 and Bana made demand, without avail, upon Mitchell Refrigeration, Inc. (formerly Mitchell’s Shreveport Restaurant Equipment Parts, Inc.), Robert J. Mitchell and Michael J. Mitchell, for the $50,000.00, pursuant to the guarantee contained in the contract.
On January 26, 1981 in suit entitled Bana’s Commercial Kitchen Parts, Inc. v. Mitchell Refrigeration, Inc., Robert J. Mitchell and Michael J. Mitchell, Bana sued to enforce the $50,000.00 guarantee and was awarded judgment against the defendants for $50,000.00 with judicial interest from January 26, 1981. The defendants appealed. Bana also appealed contending it is entitled to elect to have the $50,000.00 which it is owed by the defendants applied to the chattel mortgage note in accordance with the option contained in the sale and purchase agreement, rather than simply have a judgment against defendants for $50,000.00.
MITCHELL’S REFRIGERATION, INC. vs. BANA COMMERCIAL KITCHEN PARTS, INC.
Court of Appeal # 16,804-CA
(Suit to enforce chattel mortgage)
During the months of March, April, May and June, 1980, Bana conveyed to Acme American Repair, Inc. parts valued at Bana’s regular mark-up in the sum of $18,-772.22 in part payment of a debt owed Acme. The debt was for sums advanced by Acme to cover the organization expenses of Bana and Bana’s expenses in connection with the purchase of the parts business from Mitchell’s Shreveport Restaurant Equipment Parts, Inc.
On November 21, 1980, Bana sold Acme parts for $3,245.24 which was the cost of the parts to Bana.
Plaintiff’s chattel mortgage, which covered Bana’s inventory, provided that it “ceased” (was no longer applicable) to parts sold by Bana in the ordinary course of business. Subject to this exception the chattel mortgage obligated Bana not to sell property subject to the mortgage. The mortgage further provided:
“Should mortgagor sell, alienate or encumber the mortgaged property to the prejudice of this chattel mortgage, then, in any such event, mortgagee may declare the entire indebtedness secured by this chattel mortgage due and collectable.”
Plaintiff contends the sale to Acme in payment of Bana’s debt and the sale to Acme of parts for cost were not sales in the normal course of business and were to the prejudice of the chattel mortgage and for these reasons it was entitled to accelerate the note and foreclose on the chattel mortgage.
Acme is engaged in the commercial food equipment parts business and has its principal place of business in New York City, NY. Nathan Uretsky owns Acme and Joe Fitzpatrick was employed by Acme prior to the formation of Bana. Nathan Uretsky is president of Bana and owns one-half of the stock in Bana and Joe Fitzpatrick, who is Bana’s manager, owns one-half of the stock in Bana. It was no doubt these circumstances that caused Acme to advance the organizational expenses that placed Bana in business. The plaintiff and its officers and shareholders were well aware of the close relationship between Bana and Acme and the sale and purchase agreement that was executed between the plaintiff and *897 Bana recognized this relationship. This agreement excluded sales made by Bana to Acme from the computation of Bana’s 1980 sales for the purpose of determining if Bana had met the $480,000.00 sales guarantee. Under these circumstances it was clearly contemplated between the parties that there would be substantial transactions between Acme and Bana. Bana’s total sales for 1980 were over $500,000.00 and approximately $100,000.00 of those sales were made by Bana to Acme.
The reason why Bana sold the parts in November, 1980 to Acme for cost is because most of these parts were not being sold by Bana in the normal course of business and were deteriorating on Bana’s shelves. A few of the parts were conveyed to Acme because Bana was overstocked with them. If Bana had returned the parts to the factory a 15% restocking fee would have been charged by the factory and deducted from Bana’s cost. Bana saved the restocking fee by obtaining full cost of the parts from Acme.
It was to Bana’s advantage to pay its debt to Acme with parts conveyed with mark-up because Bana made the sales, obtained the profit and the profit was a part of the consideration used to pay the debt.
The value of the initial inventory subject to the chattel mortgage was $150,000.00 and the value of the inventory at the time this suit was filed in January, 1981, was $144,670.00. There is very little difference in the inventory and most of the difference is the result of the November, 1980, $3,245.00 sale to Acme of old parts.
As of the date this suit was filed the note had been reduced from $241,189.00 to $154,009.10. It is apparent that the balance of the note was secured by far more collateral at the time suit was filed than it was a year earlier when the note and chattel mortgage were executed.
The trial judge in his very excellent written reasons for judgment denied plaintiff’s demand to accelerate the note and foreclose on the chattel mortgage based upon the following factual determination:
“No evidence has been introduced before this court showing any sort of prejudice to Mitchell. On the contrary, Bana has demonstrated that the alienations complained of were proper and within the bounds of good business judgment. Furthermore, all payments on the note have been made timely.”
These factual determinations are fully supported by the record.
AFFIRMED.
MITCHELL’S SHREVEPORT RESTAURANT EQUIPMENT SERVICE, INC. and MITCHELL RESTAURANT EQUIPMENT, INC. vs. BANA COMMERCIAL PARTS, INC.
Court of Appeal # 16,805-CA
(Suit by Mitchell Service corporation to terminate the exclusive service and parts purchase agreement)[3]
Plaintiffs contend the exclusive service and parts purchase agreement should be terminated because Bana violated it by engaging in service work, by overcharging for parts sold to plaintiffs and by substituting parts not supplied by the factory which made the equipment which plaintiffs had ordered the parts to repair.
The contract provides that Bana shall not engage in service work. At trial it was established that one of the factories represented by Bana requested it to install a dishwasher in Tallulah, LA and this factory specifically requested that plaintiffs not do the job. Bana secured a service company normally used by plaintiffs as a sub-contractor to do work in this area to do the job. Bana made no profit from this installation. On three other occasions Bana had secured a New Orleans area service company, which Mitchell normally used to perform service work in that area, to perform warranty work for one of the factories *898 represented by Bana. Bana made no profit from this warranty work.
The evidence established that work of the nature performed by these out of town service men, all of which was in the nature of warranty work for the factory, would not have been profitable to the plaintiffs. The intent of the agreement was to prevent Bana from competing with plaintiffs in their service business. Considering the nonprofitable nature of these four isolated incidents, none of which involved a large sum of money and all of which involved work a long distance from the plaintiffs’ principal place of business in Shreveport, we find no manifest error in the trial court’s determination that Bana had substantially complied with its agreement to refrain from entering the service business.
Plaintiffs introduced into evidence twenty-three invoices reflecting alleged overcharges for parts sold to them by Bana. Seven of these invoices reflected the sale of parts acquired by Bana from Acme for less than Bana’s cost would have been if it had obtained the parts from the factory. Bana contends that it is entitled to charge plaintiffs based upon factory cost as reflected in the factory price book in the same manner that plaintiffs are charged for all other parts. Bana contends it is entitled to the benefits it is able to obtain by virtue of its close relationship with Acme. The total of these alleged overcharges resulting from Bana’s acquisition of parts from Acme is the sum of $66.87. We believe Bana’s contention has substantial merit but even if plaintiffs’ contention that this is a violation of Bana’s agreement to sell them parts based upon Bana’s replacement cost, the amount of this alleged violation is so small that it cannot serve as a basis for cancellation of the contract.
The remaining sixteen invoices upon which plaintiffs bases the overcharge claim reflect total overcharges of $391.79. The evidence establishes that many of these overcharges occurred due to simple mistakes in billing by Bana. Considering that these overcharges were made in sixteen invoices over a period of about 14 months wherein more than 1500 invoices from Bana to plaintiffs were written, the number of errors made were small and not unusual. Most of these overcharges were discovered by plaintiffs at the time they occurred and called to the attention of Bana and credits to plaintiffs were immediately issued by Bana. The record establishes that only $81.64 of these overcharges were not brought to Bana’s attention and therefore never corrected by it.
The net result of the overcharge contention is that except for the $66.87 overcharge contention based upon the parts acquired by Bana for Acme there only remains an overcharge to appellant by Bana of $81.64 out of more than $100,-000.00 of purchases made by plaintiffs from Bana. This small overcharge existed only because plaintiffs never brought it to Bana’s attention and requested credit for it. These overcharges are very small when considered in light of the large volume of business transacted between plaintiffs and Bana. Bana substantially complied with its contract to base its sale price on parts sold to plaintiffs upon its replacement cost and the trial court did not abuse its discretion in refusing to cancel the contract on this basis. Olinkraft, Inc. v. Gerard, 364 So.2d 639 (La.App. 2d Cir.1978).
Plaintiffs contend that Bana substituted for factory parts ordered to repair equipment parts made by others not used by the factory in the manufacture of the equipment which plaintiffs were servicing. The trial court found it was established there had been some substitution of parts by Bana and that Bana willfully reflected the substituted part as the ordered part and charged the higher price that would have been required if the part had been the genuine factory part ordered. The record supports this factual determination. However, all the evidence requires the conclusion that Bana only engaged in this practice when it did not have the factory ordered part available with which to fill the order. Joe Fitzpatrick, Bana’s manager, testified that Bana’s policy was to supply plaintiffs with the part ordered by them *899 and the totality of the evidence establishes this to have been the normal business practice of Bana.
The plaintiffs primarily contend Bana substituted Watt’s Safety Valves (pop-off valves) for safety valves used by the manufacturer of the cooking equipment and substituted Robert Shaw Thermostats for thermostats used by the manufacturer of various cooking units. This issue of substituted parts is interrelated with the overcharge issue because when the substituted part is priced based upon the replacement cost of the factory part an overcharge results. The invoices analyzed in connection with the overcharge issue are the invoices relied upon by plaintiff to establish the contractual violation of substitution. On these invoices the substitution of seven thermostats and four safety valves reflect overcharges totaling $187.49.
It is therefore apparent that the substitution of parts was a very rare occurrence when it is considered in light of the more than $100,000.00 volume of sales made by Bana to plaintiffs during the approximately 14 month period in which they occurred. This conclusion is further supported by the testimony of plaintiffs’ witness Jim Boyter who had been employed as a serviceman for plaintiff for five years. This witness testified that he picked up parts for plaintiffs from Bana on a daily basis and only once was he given a substituted part.
The evidence established that the substitution of parts under the circumstances which occurred in this case is a standard practice in the cooking equipment parts industry and was a practice engaged in by the Mitchell parts corporation before it conveyed its parts business to Bana. The plaintiffs never complained about the substitution of parts to Bana, other than to seek a refund for the overcharge which resulted from the substitution. No doubt the reason why plaintiffs did not complain about the substitution practice is because it is prevalent in the industry and was a practice engaged in by Bana’s predecessor from whom plaintiffs had formerly acquired their parts. By their silence and inaction plaintiffs have assented to Bana’s practice of occasionally substituting a non-factory part for a factory ordered part when Bana does not have the factory ordered part available and are not entitled to cancel the contract based upon the substitution of parts. Davis v. Laster, 242 La. 735, 138 So.2d 558 (1962). See also RTL Corp. v. Manufacturer’s Enterprises, Inc., 429 So.2d 855 (La.1983).
We conclude the trial court was correct in rejecting appellant’s demand to cancel the exclusive service and parts service agreement.
AFFIRMED.
BANA COMMERCIAL KITCHEN PARTS, INC. vs. MITCHELL’S SHREVEPORT RESTAURANT EQUIPMENT SERVICE, INC; MITCHELL RESTAURANT EQUIPMENT, INC., ROBERT J. MITCHELL and MICHAEL MITCHELL
Court of Appeal # 16,818-CA
(Suit by Bana seeking to enforce option to purchase the assets of the Mitchell service corporations and for damages)
The exclusive service and parts purchase agreement requires defendants, the Mitchell’s service corporations (hereafter referred to as Mitchells), to purchase all parts used in their service work from Bana except those parts listed in Schedule “A” which provides:
SCHEDULE A

Parts which Mitchell is not Obligated to Purchase from Bana

a) Freon
b) Nipples and fittings used in commercial refrigerator repair.
c) Compressors used in commercial refrigeration.
d) Any other parts required to service commercial refrigerator equipment unless Bana can supply such parts at the same or less than Mitchell can obtain elsewhere, or unless Bana is the sole manufacturer’s distributor for the territory.
*900 The agreement contains a provision that in the event the Mitchells purchase parts from others which they are required to purchase from Bana that this violation shall give Bana the option to purchase their service business as per detailed option provision contained in the agreement.
Bana contends in this suit that Mitchells have purchased parts from others which they were required to purchase from it and for this reason it has the option to purchase Mitchell’s business by the terms of the contract. Bana here seeks to enforce that option.
Bana further sued for the damages it sustained in loss of profits caused by Mitchells purchasing parts from others which they were required to purchase from Bana.
The issue presented for decision is whether or not Mitchells have in fact breached the agreement by purchasing parts from others that they were required to purchase from Bana.
The Mitchells contend the items purchased by them from others upon which Bana bases its suit were excluded from the agreement by Schedule “A” or were not parts of cooking or refrigeration equipment and not covered by the agreement.
The dispute as to whether many of the parts purchased by Mitchells were excluded from the agreement by Schedule “A” stems from a provision of the contract which removes Schedule “A” parts from the exclusion once an exempted part has been purchased from Bana and requires the Mitchells to thereafter purchase all of the formerly exempted parts from Bana.
The reason for this contractual provision is directly related to the provision of the contract wherein Bana’s vendor (Mitchell’s parts corporation), Robert J. Mitchell and Michael Mitchell guaranteed that Bana’s sales during its first year of operation would be $480,000.00. The guarantee provided that in the event Bana’s sales were less than $480,000.00 that the guarantors would pay Bana the difference between its actual sales and $480,000.00 up to a limit of $50,000.00. At the time the guarantee was negotiated the guarantors had indicated that in the event Bana’s sales appeared to be below an amount that would produce an annual total of $480,000.00 from the parts covered by the agreement that the Mitchell’s service corporations would increase Bana’s sales by purchasing parts from it that were excluded from the agreement by Schedule “A” Bana had no objection to its sales being increased by this method provided it could rely upon a continuation of the purchase of the excluded parts by the Mitchell’s service corporations beyond the first year. Bana needed this assurance in order to know how to stock the theretofore excluded items and further needed this assurance in order to be able to rely upon the expectation of doing the $480,000.00 sales volume in future years. It was for these reasons that Bana required the provision in the contract that once an exempted part on Schedule “A” was purchased from it the part was no longer exempted from the provisions of the contract requiring Mitchells to purchase all parts from Bana.
The concept of placing an excluded part under the agreement as a part the defendants were required to purchase from Bana is referred to by the litigants as “triggering”. The dispute in this area is whether the purchase of an excluded part only triggers the application of the contract to that particular brand name part or does it trigger the application of the contract to all similar parts manufactured by other factories. Bana contends that the purchase of an excluded part made the contract applicable to all similar parts made by all factories. The defendants contend that a purchased excluded part only triggered the application of the contract to that particular brand name part. It was stipulated that Mitchells purchased from Bana all triggered parts according to their conception of what parts were excluded from Schedule “A” by the first purchase of the part from Bana and they did not purchase from any source other than Bana an identical Schedule “A” part once they had first purchased it from Bana.
The second area of dispute requires a determination of what is a “part”. Mitch- *901 ells contend a part is limited to those items which are actually included within or directly attached to a piece of cooking or refrigeration equipment and directly related to the function of the equipment. Bana contends the term part includes all accessory material such as electric and plumbing supplies used to place the equipment into operation though the material is not a component part of the equipment nor attached directly to the equipment.
The trial judge adopted the defendant’s contention that only the identical brand name part is triggered by its first purchase and that the term “parts” includes only a component of the cooking or refrigeration equipment.
Bana, the appellant, assigns as error these two factual determinations by the trial judge.
The trial judge made the following determination on the triggering issue in his written reasons for judgment:
Bana spent a great deal of trial time establishing a series of “triggering invoices” with subsequent purchases attached. Bana’s argument was that once an item, such as a compressor for use on refrigeration equipment was purchased from Bana it was no longer exempted (via Schedule A) from the exclusive parts agreement. Mitchell agreed that the triggering invoices triggered certain items, but argued that the purchase of a part triggered the manufacturer of that part, for example Tecumseh compressors, rather than all of the parts by any manufacturer, such as all compressors. Counsel for Mitchell shows the error of Bana’s argument when he showed that their logic would require purchase of expensive air conditioner compressors from Bana if a relatively inexpensive compressor for a water cooler had been purchased from Bana.
The parties stipulated that none of the subsequent purchases by Mitchell showed a purchase of a part made by the same manufacturer as the preceeding triggering invoice. This court believes Mitchell’s position to be the more reasonable interpretation of the triggering effect of purchases under Schedule A. Bana admitted that the primary purpose of the trigger was to prevent Mitchell from loading Bana up with orders in 1980 for parts that they would not continue to order from Bana. Bana stated that they wanted an accurate reflection of what parts they would need to stock. In accordance with that wish, Mitchell would buy all parts of a triggered manufacturer from Bana in order that Bana would know to stock parts of that manufacturer. Consequently, Mitchell has not breached their obligation under Schedule A.
The factual conclusion of the trial court on this issue is supported by substantial evidence in the record. The defendant’s witnesses testified as to the difference in size, application and price of various brand name parts including compressors and motors. As the trial judge pointed out it is unreasonable to conclude that the purchase of a small inexpensive compressor for one brand name water cooler would trigger all compressors made by all manufacturers and used for many other types of equipment.
All the evidence establishes the purpose intended by the triggering clause in the contract and the trial judge’s interpretation fully satisfies that purpose. We agree with the trial judge that the application of the contract to an excluded part is triggered only to the particular brand name part purchased by the Mitchell service corporations.
The trial court found that only items which are parts of the equipment being serviced are covered by the contract. The trial judge reasoned:
Mitchell claims the ability to purchase “commodity items” from whatever source it pleases. This court agrees. It is common sense that wall switches, hose, pipe, and the like are not in the same class of items as popoff valves and thermostats. It is the court’s opinion that purchase of items that are not part of the equipment being serviced and not available from the manufacturer of the *902 equipment for the specific piece of equipment being serviced are not within the scope of the exclusive parts agreement. The most reasonable interpretation of the contract would be to include parts specified by the manufacturer and marketed by the manufacturer for particular equipment.
There were several defense witnesses who were experienced in the industry who testified that parts are those items manufactured to be used as a component of the equipment. These witnesses testified that items such as wire, pipe, switches and other ordinary electrical and plumbing supplies that are available from sources other than the manufacturer of the equipment and which are not directly attached to or included within the equipment are not considered to be parts by the service industry. These witnesses pointed out that parts are usually available at a 50% discount where the plumbing and electrical supplies used in the installation of the equipment is generally only available at a 33% discount. The significance of this evidence is that in the industry the word “parts” has a connotation and meaning that does not include electrical and plumbing supplies.
There is substantial evidence to support the trial court’s determination of the parts issue.
We find no manifest error in the trial court’s determination that the Mitch-ells bought no parts of any consequence in violation of the exclusive service and parts purchase agreement.
AFFIRMED.
BANA COMMERCIAL KITCHEN PARTS, INC. vs. MITCHELL’S REFRIGERATION, INC., ROBERT J. MITCHELL and MICHAEL J. MITCHELL
Court of Appeal # 16,806-CA
(Suit by Bana to enforce the $50,000.00 guarantee because its sales failed to meet the $480,000.00 sales target)
Mitchell’s Refrigeration, Inc., Robert J. Mitchell and Michael J. Mitchell appeal a judgment against them for $50,000.00 in favor of plaintiff, Bana Commercial Kitchen Parts, Inc., based upon a provision in the sale and purchase agreement wherein the appellants guaranteed Bana it would have sales during the first year of operation of $480,000.00. Bana appealed this judgment contending it was entitled to a greater award against appellants under the guarantee provision.
The negotiations between Bana and Mitchell’s Shreveport Restaurant Equipment Parts, Inc. (now Mitchell’s Refrigeration, Inc.) that eventually led to the sale and purchase agreement were conducted over many months and throughout these negotiations Mitchell Parts had represented to Bana that its annual sales for 1978 and 1979 were $500,000.00.
At the outset Mitchell Parts had further represented to Bana that it operated a sales outlet in Monroe which contributed to the annual sales. Just before the final negotiations resulting in the sale and purchase agreement were concluded, Bana discovered Mitchell Parts had closed its Monroe operation and Bana, from a cursory examination of Mitchell Parts’ books, believed that approximately $100,000.00 of Mitchell Parts’ annual sales were generated in the Mitchell Parts’ Monroe store. When Bana discovered the Monroe store had been closed it indicated to Mitchell Parts that it was no longer interested in concluding the planned transaction. In response to this position taken by Bana, Mitchell Parts agreed that in the event Bana would proceed with the transaction that Mitchell Parts would guarantee that Bana, during its first year of operation, would have sales in the amount of at least $480,000.00, excluding Bana’s sales to Acme, and in the event that Bana’s sales fell below this target figure that Mitchell Parts would pay unto Bana the difference between its actual sales and the sum of $480,000.00 with a maximum limits of Mitchell Parts’ obligation to pay being the sum of $50,000.00.
*903 Based upon this guarantee of 1980 gross sales by Mitchell Parts, Bana proceeded to consummate the transaction and the guarantee was incorporated in the sale and purchase agreement.[4] It was stipulated at trial that Bana’s 1980 sales were $419,-354.00, excluding Bana’s sales to Acme of $98,986.32. The defendants admitted that Bana fell short of the guaranteed sales target figure by more than $50,000.00 but they contended they did not owe the guarantee because Bana did not perform the implied obligation of conducting its business in an aggressive, efficient manner in order to have produced sales in at least the amount of the target figure. The defendants contended Bana should have employed numerous salesmen to contact existing in-town and out-of-town customers and prospects for the purpose of maintaining and improving sales. The defendants produced evidence at trial that a very large and old Shreveport parts firm maintains a large staff of salesmen for this purpose and based on this evidence contends Bana violated its implied obligation to do likewise in order to have reached the sales target.
The trial judge in his reasons for judgment, pointed out that Bana’s new and small volume of business at its outset was not analgous to the large and well-established parts firm that hired large numbers of salesmen. The trial judge further found there was no evidence Bana actually tried to keep its sales low and that because it failed to reach the sales target agreed upon by the defendants that the defendants owed Bana the $50,000.00.
Joe Fitzpatrick, Bana’s manager, testified he made what calls he could upon local accounts and that he worked in every way to produce for Bana the maximum possible sales. We note that Bana’s actual sales, including their business with Acme, exceeded the $500,000.00 volume that had formally been achieved by Mitchell Parts. We further note the record establishes that approximately $100,000.00 of Mitchell Parts’ former volume was based upon transactions through its Monroe outlet, a source of sales not available to Bana.
Considering these factors it appears Bana’s sales efforts during its first year in operation were of a quality comparable to that of its predecessor. It cannot be said the trial judge’s refusal to find Bana had neglected its obligation to diligently seek sales was clearly wrong.
Bana’s appeal is based upon the provision in the guarantee agreement which gave Mitchell Parts, in the event it became liable to pay under the terms of the guarantee agreement, an option of paying the $50,000.00 cash or “reduce the purchase price and the earliest annual notes, or any combination of cash and annual payment” and further provided that “in the event seller shall elect payment by reduction of earliest annual notes due, no interest shall accure of such notes.” (see Footnote 4) Bana contends that when Mitchell Parts (now Mitchell’s Refrigeration, Inc.) failed to exercise the option after it received notice that Bana failed to reach the target sales goal, that the option of how the $50,-000.00 was to be paid then became available to Bana and that Bana had exercised the option in a supplemental and amended petition filed by it in these proceedings on September 25,1981. This amended petition *904 reflects that Bana exercised the option to have the $50,000.00 applied by Mitchell’s Refrigeration, Inc. to “reduce the purchase price and the earliest annual payment.”
The defendants contend and the trial court found that Bana did not have this option but rather that the option was solely in favor of Mitchell’s Refrigeration, Inc. and for this reason the judgment for $50,-000.00 cash against Mitchell’s Refrigeration, Inc. was the correct judgment based upon the guarantee agreement.
The issue then presented is whether or not Mitchell’s Refrigeration’s default in payment, which was a failure by it to elect on either option of payment, resulted in shifting the option in the manner of payment to Bana. Bana cites the cases of Anderson v. Rexroad, 180 Kan. 505, 306 P.2d 137 (1957) and Prudential Insurance Co. of America v. Faulkner, 68 F.2d 676 (10th Cir.1934), 17 Am.Jur. 2d § 364 (p. 806) as authority for the position that if one party to an agreement having an option to do or not to do something repudiates same the option passes to the other party. Bana cites no Louisiana authority supporting the rule of law. In our research we have not found any Louisiana cases which support Bana’s rule of law but we have found the following new article in the Civil Code which supports Bana’s contentions:
Art. 1810. Delay in exercising choice
When the party who has the choice does not exercise it after a demand to do so, the other party may choose the item of performance.
This article was enacted by acts of 1984, #331 and became effective January 1, 1985. The comment under the article recognized that it is new but provided:
It does not change the law however. It expresses a consequence of a principle implied in several Articles of the Louisiana Civil Code of 1870, such as C.C. Arts. 2556 and 2694 (1870). See 2 Litvinoff, Obligations 470 (1975). It follows the trend among modern codes.
We find the reasons given in the comments are sound and the law expressed in the article is not new and is applicable to the issue here to be decided. We conclude that when Mitchell’s Refrigeration, Inc. refused to make the $50,000.00 cash payment following receipt of notice that it was due that this had the effect of giving to Bana the right to exercise the option contained in the guarantee agreement as to the method of payment. Bana has effectively exercised that option to have the proceeds of the $50,000.00 applied to the earliest annual payment on the credit portion of the purchase price.
Bana contends in brief that the effect of the option which it has selected results in there being no interest owed by it on the unpaid principal balance until January 1, 1983 at which time the unpaid balance would be $119,832.30.[5] We do not agree *905 with Bana’s contention but construe the totality of option #2 in the guarantee agreement to mean that Mitchell Parts could retain the $50,000.00 and apply it to the installments owed by it as they became due until such time as the full amount of the $50,000.00 was liquidated by the application of it to the installments. The contemplation of the agreement being that while Mitchell had the $50,000.00, which would have been in the possession of Bana and available for Bana’s use except for Mitchell having exercised option # 2, that the $50,000.00 or any portion thereof which had not been liquidated by the application to an installment due on the note, would be treated as though it had been an advance payment on the principal of the note and no interest would be due on that portion of the principal. The reason for this is that Mitchell had in effect made an advance collection on the principal which it was entitled to use to liquidate the installments of the note as they became due up to the extent of the $50,000.00 advance collection. We conceive it to be totally unrealistic to construe this agreement in the manner contended by Bana because following Bana’s construction no interest would be due on the total unpaid balance of the note which substantially exceeds the $50,000.00 debt owed to Bana under the guarantee agreement. The unpaid balance on the debt at the time the $50,000.00 became due was $171,189.00 and there is no sound reason why the parties would ever have intended for there to be no interest due on this total sum merely because Bana was entitled to receive $50,000.00 under the guarantee agreement, which Mitchell could retain under the option.
On January 1, 1981 when Bana became entitled to the $50,000.00, it owed an interest free installment of $17,118.90 on Mitchell Refrigeration, Inc.’s unpaid principal balance of $171,189.00.[6] Under the option exercised by Bana this installment was paid from the guarantee leaving owed on the guarantee the sum of $32,881.10 and leaving an unpaid principal balance owed on the note of $154,070.10.
On January 1, 1982 Bana owed 12% interest on the principal balance of the note, less the amount which Mitchell’s Refrigeration, Inc. had in its possession remaining from the guarantee, this being the sum of $32,881.10. No interest was owed on this amount by Bana because Mitchell had it available for use throughout the year 1981. When this amount is deducted from the unpaid principal balance of the note it results in Bana’s interest being computed at 12% of $121,189.11, resulting in Bana’s interest obligation due January 1, 1982 being the sum of $14,542.68, plus the annual installment on the principal which is the sum of $17,118.90, resulting in Bana owing Mitchell Refrigeration, Inc. a total of $31,-661.58. This amount was paid from the balance of the guarantee in the possession of Mitchell Refrigeration, Inc. of $32,881.10 and following said payment the sum of $1,219.52 was the remaining balance of the guarantee.
On January 1, 1983 Bana owed IIV2[7] interest on the then principal balance of the note of $136,951.20, less $1,219.52 which Mitchell’s Refrigeration still had retained of the guarantee figure that had not been used to liquidate earlier installments on the note, thus resulting in Bana’s interest due January 1, 1983 being computed on an unpaid balance of $135,731.68. Bana’s inter *906 est due at this time was the sum of $15,-609.14. This sum, added to the principal installment due of $17,118.90, results in Bana’s January 1,1983 obligation being the sum of $32,728.04, less the amount of $1,219.52 (the amount retained by Mitchell from the guarantee not yet exhausted) resulting in the actual amount owed January 1, 1983 being the sum of $31,508.52. The unpaid principal balance on the note following the payment of the January 1, 1983 installment would be the sum of $119,-832.30. The note would thereafter be paid according to its terms because the guarantee had been fully liquidated at the time of the payment of the January 1, 1983 installment.
On January 16,1981, Bana paid the January 1, 1981 installment of $17,118.90, which it did not owe because the installment was paid by the guarantee under the option exercised by Bana, and therefore Bana is entitled to a judgment for this amount bearing legal interest from January 16, 1981. On January 1, 1982 Bana paid the total sum of $35,607.31, which it did not owe, because principal and interest then due had been paid by the guarantee under the option elected by Bana and therefore Bana is entitled to a judgment for this amount, plus legal interest from January 1, 1982.
On January 1,1983 Bana paid the sum of $32,868.29 when it actually only owed $31,-508.52, which was an overpayment of $1,359.77 and it is entitled to a judgment for this overpayment, with legal interest, from January 1, 1983.
In order to award Bana the judgment to which it is entitled based upon the option of payment of the guarantee elected by it we set aside the next to the last paragraph of the judgment rendered in these consolidated cases and recast it to read as follows:
“Suit No. 276,242”
“In this case judgment is rendered in favor of Bana Commercial Kitchen Parts, Inc. and against Mitchell’s Refrigeration, Inc., Robert J. Mitchell and Michael J. Mitchell in solido, in the following amounts:
1. $17,118.90 with legal interest from January 16, 1981 until paid;
2. $35,607.31 with legal interest from January 1, 1982 until paid; and
3. $1,359.77 with legal interest from January 1, 1983 until paid.”
The judgment appealed in these consolidated cases as amended is AFFIRMED and all cost on appeal are assessed equally to Bana Commercial Kitchen Parts, Inc. on one hand and Mitchell’s Refrigeration, Inc., Mitchell Shreveport Restaurant Equipment Service, Inc., Mitchell Restaurant Equipment, Inc., Robert J. Mitchell and Michael J. Mitchell, in solido, on the other hand.

. Mitchell Parts also sold parts to others engaged in the maintenance of commercial cooking and refrigeration equipment.

. Bana asserted certain claims in reconvention in this suit which were denied but Bana took no appeal from the trial court judgment.

. This suit also contained a demand for damages which were not awarded by the trial court but plaintiffs do not assign the failure to receive damages as error.

. m) Seller’s sale of parts, net of sales discounts and returns for calendar 1978 was not less than $500,000. and for calendar 1979 of not less than $500,000. If the Buyer’s sales of parts in the 12 months following the Closing Date, net of sales discounts and returns and sales to Acme American Repairs, Inc. is less then (sic) $480,000, then the Seller shall pay to the Buyer the difference between the Buyer’s sales and $480,000., but in no event more than $50,000.

In the event that Seller is obligated to make payment because of failure of Buyer to meet the $480,000. sales target, Seller shall have the option to (i) make payment in cash to Buyer or (ii) any combination of cash and annual note payment. The Seller shall make its election within 15 days after written notice by Buyer of its failure to meet the $480,000. sales target. In the event Seller shall elect payment by reduction of earliest annual notes due, no interest shall accrue of such notes. In the event that Buyer shall notify Seller of Buyer’s failure to reach the $480,000. sales target, Seller shall have the option to audit Buyer’s sales books and records within the 15 day election period.

. (a) Bana would not have paid the initial annual principal payment of $17,118.90 in January of 1981 (interest was waived for the first year); Mitchell, in effect, would have paid that from the $50,000.00 leaving a balance on the $50,-000.00 of $32,881.10. The balance on the note would then have been $154,070.10 (an earlier $70,000.00 principal payment had been made), and no interest would be accruing thereon.
Bana should be awarded its payment and legal interest from January 1, 1981, until paid, on the $17,118.90 which it paid to Mitchell and which Mitchell has had the use of during this period of time.
(b) In January, 1982, Bana would have owed principal of $17,118.90, but no interest because of its election. Instead, Bana paid a principal and interest payment to Mitchell, totalling $35,-607.31. Had Bana's election been in effect, Bana would have made no payment and no interest would be running. Mitchell, in effect, would have paid the principal of $17,118.90 from the $32,881.10 remaining of the $50,000.00 guarantee, leaving a balance of $15,762.20 on the guarantee and a balance of $136,951.20 on the Note.
Bana should recover from Mitchell its $35,-607.31 with legal interest thereon from January 1, 1982, until paid.
(c) In January, 1983, if Bana’s election had been in effect, it would have paid principal only of $17,118.90 and no interest would have accrued. Instead, Bana paid principal and interest of $32,868.29. Mitchell should have used the remaining $15,762.20 of the $50,000.00 guarantee and Bana should have paid the $1,356.70 difference. Interest would once again begin running on the Note; the $50,000.00 would have *905 been paid; and the principal balance on the Note would be $119,832.30.
Bana should recover its $32,868.29 with legal interest thereon from January 1, 1983, until paid.

. The note provided no interest was owed for the first year.

. The note provided for an annual interest rate of 12% or the prime rate of interest in effect at the Citibank, New York, NY on December 1st of each calendar year preceding the date of the annual payment due on said note, whichever is the lesser rate. We note from the amount of the payment actually made by Bana on January 1, 1983 that it calculated the interest based upon a rate of 11½ and therefore we assume this was the correct rate by the terms of the note since none of the litigants raised this issue in brief. Apparently the prime rate on December 1st pri- or to January 1, 1983 was 11.5% which would have then been applicable rather than the 12%.